**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Annick M. Persinger (State Bar No. 272996)
Yeremey Krivoshey (State Bar No. 295032)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: ltfisher@bursor.com
          apersinger@bursor.com
          ykrivoshey@bursor.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES LOREN GIBBS, individually and on behalf of all others similarly situated,<br><br>                                        Plaintiff,<br><br>      v.<br><br>PROPHASE LABS, INC.,<br>                                        Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

CLASS ACTION COMPLAINT

Plaintiff James Loren Gibbs ("Plaintiff") brings this action on behalf of himself and all other similarly situated persons residing in California against Defendant ProPhase Labs, Inc. ("ProPhase" or "Defendant").  Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to him, which are based on personal knowledge.

## INTRODUCTION

1.      This is a class action lawsuit against Defendant for the false and misleading marketing, advertising, and sale of its homeopathic over-the-counter ("OTC") line of Cold-EEZE Cold Remedy Products, which includes Cold-EEZE Cold Remedy Lozenges,[1] Cold-EEZE Cold Remedy Sugar Free Lozenges,[2] Cold-EEZE Cold Remedy Oral Spray,[3] Cold-EEZE Cold Remedy Daytime/Nighttime QuickMelts, Cold-EEZE PLUS Immune Support QuickMelts, and Cold-EEZE PLUS Immune Support and Energy QuickMelts, (collectively, the "Cold-EEZE Products"). Defendant represents on the packaging and labeling of the Cold-EEZE Products that Cold-EEZE (a) "reduce[s] the duration of the common cold;" (b) is "clinically proven to reduce the duration of the common cold by almost half;" (c) "reduces the severity of cold symptoms:  cough, sore throat, nasal congestion, post nasal drip and/or hoarseness;" (d) "shortens your cold, works faster;" and (e) is "clinically proven to shorten your cold by almost half" (together with the other misrepresentations discussed herein, the "Misrepresentations").  All of the Cold-EEZE Products share the same Misrepresentations, active ingredients, and marketing scheme.

2.      The Misrepresentations are false and misleading.  None of the studies relied upon by Defendant demonstrate that Cold-EEZE is clinically proven to reduce the duration of the common cold or effective to reduce the severity of cold symptoms.  More importantly, studies that have tested Cold-EEZE, including one partially funded by Defendant, have concluded that Cold-EEZE

---

[1] Defendant offers the lozenges in the following six flavors:  Cherry, Honey Lemon, Strawberries & Cream, Tropical Orange, Lemon Lime, and Mint Frost.

[2] Defendant offers the sugar free lozenges in the following four flavors:  Sugar Free Honey Lemon, Sugar Free Wild Cherry, Sugar Free Pomegranate, and Sugar Free Chocolate Mint.

[3] Defendant offers the oral spray in two flavors, Mint and Cherry.

is ineffective – it does not reduce either the duration of the common cold or the severity of its symptoms.

3.      This is not ProPhase's first rodeo.  In 1999, ProPhase's predecessor – The Quigley Corporation ("Quigley") – entered into a Consent Agreement with the Federal Trade Commission ("FTC") to settle FTC charges for claims made on the QVC cable network that Cold-EEZE could prevent colds and reduce the risk of contracting pneumonia, among other things.  Pursuant to the Consent Agreement, Quigley agreed to stop making those representations.

4.      As a direct and proximate result of Defendant's false and misleading labeling and marketing, Plaintiff and members of the Class, as defined herein, purchased Defendant's ineffective Cold-EEZE Products.  Specifically, Defendant deceived Plaintiff into believing that the Cold-EEZE Products were clinically proven and effective for reducing the duration of the common cold and effective for reducing the severity of its symptoms.  As a result, Plaintiff and members of the Class purchased the Cold-EEZE Products, suffered injury in fact, and suffered an ascertainable out-of-pocket loss.  Plaintiff and members of the Class seek a full refund of the transaction and/or all further statutory, equitable and injunctive relief as provided by applicable law.

5.      Plaintiff seeks relief in this action individually, and on behalf of similarly situated purchasers of Cold-EEZE residing in California for breach of express and implied warranties, as well as for violation of California's Consumers Legal Remedies Act ("CLRA"), Civil Code §§ 1750, *et seq.*, California's Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200, *et seq.*, and California's False Advertising Law ("FAL"), Bus. & Prof. Code §§ 17500, *et seq.*

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one class member is a citizen of a state different from Defendant.  For fiscal year 2013, ProPhase recorded revenues of

$25,032,000, of which approximately 94%, or $23.5 million, is attributable to sales of Cold-EEZE.[4]

7.      This Court has personal jurisdiction over Defendant because Defendant conducts substantial business within California, such that Defendant has significant, continuous, and pervasive contacts with the State of California, and because Defendant made misrepresentations to Plaintiff in California and sold one of the Products to Plaintiff in California.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the challenged mislabeling, sales, and marketing practices have been disseminated and committed in this District; because Defendant is subject to personal jurisdiction in this District; because Plaintiff resides in this District; and because Plaintiff purchased one of Defendant's products in this District.

## THE PARTIES

9.      Plaintiff James Loren Gibbs is a citizen of California, residing in Belmont, California.  In or about January 2013, Plaintiff Gibbs purchased a package of Cold-EEZE lozenges for approximately $6 from a Walgreens retail store located at 2300 Otis Drive, Alameda, California 94501.  Prior to his purchase of Cold-EEZE, while suffering from a common cold, Mr. Gibbs reviewed the product's packaging and labeling.  The package he purchased represented that Defendant's Cold-EEZE Products would "shorten[] [his] cold" and were "clinically proven to reduce the duration of the common cold by almost half."  The package also represented that the Cold-EEZE Product would "reduce the duration of the common cold" and "reduce[] the severity of cold symptoms:  cough, sore throat, nasal congestion, post nasal drip and/or hoarseness."   Finally, an insert in the product's package from "Ted Karkus," "CEO, ProPhase Labs" represented that Cold-EEZE was guaranteed, stating:  "Cold-EEZE is the right remedy to shorten your cold, I guarantee it!"  Plaintiff Gibbs saw these representations prior to and at the time of purchase, and understood them as representations that the Cold-EEZE Product he purchased was (i) clinically proven to reduce the duration of his cold by almost half the time that he would have had the cold if

---

[4] March 27, 2014 10-K at 22, 39 *available at*
https://www.sec.gov/Archives/edgar/data/868278/000114420414018406/v371069_10k.htm (last visited May 15, 2014).

he were not using Cold-EEZE, (ii) effective for reducing the severity of his cold symptoms, including coughing, nasal congestion, and a sore throat, and (iii) guaranteed to be effective to shorten his cold.  He relied on these representations in deciding to purchase the Cold-EEZE Product.  Accordingly, these representations were part of the basis of the bargain, in that he would not have purchased Cold-EEZE had he known that it was, in fact, not clinically proven to reduce the duration of a cold and the severity of cold symptoms.  Ultimately, Cold-EEZE was worthless (and certainly worth less than its misrepresentations suggested).  Even though Plaintiff Gibbs used Cold-EEZE according to the directions for use on the back of the package, Cold-EEZE did not perform as advertised.  In fact, it was totally ineffective.

10.     Defendant ProPhase Labs, Inc. is a Nevada corporation with its headquarters at 621 N. Shady Retreat Road, Doylestown, Pennsylvania 18901.  ProPhase is a publicly traded company currently registered on the NASDAQ Global Market.  Prior to May 6, 2010, ProPhase operated as The Quigley Corporation ("Quigley").  ProPhase has and is engaged in the manufacture, distribution, marketing, and sale of over-the-counter cold remedy products to consumers through national chain, regional, specialty, and local retail stores.  Its principal products are the Cold-EEZE Products, which are zinc gluconate glycine products that it claims are proven by clinical studies to reduce the duration and severity of the common cold by nearly half.

11.     Defendant advertises, markets, and sells Cold-EEZE widely throughout California, and nationwide.

**FACTS COMMON TO ALL CAUSES OF ACTION**

**A.  Defendant's False And Misleading Packaging And Labeling**

12.     All of the Cold-EEZE Products are essentially the same product delivered in different forms.  For example, Defendant represents that "[t]he new Cold-EEZE Cold Remedy Oral Spray is formulated with zinc gluconate, the same effective active ingredient found in the best-selling, clinically proven and #1 pharmacist recommended Cold-EEZE lozenges.  The effective unique formula reduces the duration of the common cold."[5]  The same is true for each of the three

---

[5] *See* http://www.cold-eeze.com/products/oral-spray/with%20zinc%20gluconate (last visited May 15, 2014).

QuickMelts varieties – according to Defendant one tablet of each variety "delivers the same amount of active ingredient (zinc gluconate glycine) as one clinically-proven and #1 pharmacist recommended Cold-EEZE lozenge." [6]

13.    On the labeling of its Cold-EEZE Products, depicted below, Defendant makes numerous false and misleading advertising claims.

14.    The labeling of all Cold-EEZE Products represents that Cold-EEZE "reduce[s] the duration of the common cold" and "reduces the severity of cold symptoms:  cough, sore throat, nasal congestion, post nasal drip and/or hoarseness":



Additionally, the labeling represents that Cold-EEZE "[s]hortens your cold, works faster":

1
2
3
4
5
6
7
8
9
10
11
12

 

13  Regardless of the product, the message to consumers is clear and conspicuous: Cold-EEZE will

14  reduce the duration and severity of your cold.  However, as shown below, these claims are

15  provably false.

16          15.     The label of the Cold-EEZE Lozenges bears an additional misleading tagline:

17  "Clinically proven to reduce the duration of the common cold."  In fact, this central claim appears

18  on the labeling of the Lozenges in four different places:

19
20
21
22
23
24
25
26
27



28          16.     Defendant further reaffirms this message on the back label of the Lozenges by

representing to consumers that "[c]linical studies have shown:  [t]he unique Cold-EEZE formula reduces the duration of the common cold by almost half."   In fact, as discussed more fully below, Defendant's "clinical pro[of]" actually demonstrates that Cold-EEZE will not shorten a cold or reduce the severity of its symptoms.



17.     Defendant deliberately and intentionally made the material Misrepresentations about its Cold-EEZE Products.  Notably, one of the scientific studies that demonstrates the falsity of Defendant's Misrepresentations was partially funded by Defendant ProPhase.  Thus, despite Defendant's knowledge about the study results showing the falsity of its Misrepresentations, Defendant continues to showcase the Misrepresentations prominently on its Cold-EEZE packaging while simultaneously failing to disclose the adverse results of its own study to consumers.

**B. Clinical Studies Show That Cold-EEZE Is Not Effective**

18.     Clinical studies demonstrate the falsity of Defendant's Misrepresentations.  For example, the Macknin, Piedmonte, *et al*., 1998 Study (the "Macknin Study"), funded in part by Defendant, concluded that Cold-EEZE was "***not effective*** in treating cold symptoms in children and adolescents."[7] (emphasis added).  Importantly, the Macknin Study does not suffer from the infirmities that the studies cited by Defendant do.  In fact, the Macknin Study was a randomized, double blinded, and placebo-controlled 249-person study that satisfied all of the 11 criteria

---

[7] Macknin, Piedmonte, *et al*., *Zinc Gluconate Lozenges for Treating the Common Cold in Children: A Randomized Controlled Trial*, JAMA. 1998; 279(24): 1962-1967.

identified by Thomas J. Caruso as "necessary for valid experimental design." The authors found that: (1) the time to resolve all cold symptoms was identical in the placebo and Cold-EEZE groups; (2) Cold-EEZE had "no significant effect on the time for resolution on any of the individual symptoms;" (3) difference in school absences between the groups was not statistically significant; and (4) slightly more students in the Cold-EEZE group experienced at least one adverse effect than in the placebo group. The Macknin Study ultimately concluded that "[a]dditional studies in all age groups with different dosages and formulations of zinc lozenges and with virologic testing are needed to define what role, if any, zinc has in the treatment of common cold symptoms."

19.     In another relevant study, Turner, Cetnarowski, 2000 (the "Turner Study"), the authors found that Cold-EEZE "had no effect on the duration or severity of symptoms in either the experimental or natural study model" and "zinc compounds appear to have little utility for common-cold treatment."[8] The Turner Study was a double-blind, randomized, placebo-controlled study on the effect of zinc treatment on the duration of severity of common-cold symptoms using zinc acetate lozenges, placebo lozenges, and Cold-EEZE lozenges. Like the Macknin Study, the Turner Study met all 11 criteria set forth in the Caruso Study.

20.     Furthermore, Cold-EEZE is not simply ineffective for "reduc[ing] the duration of the common cold," it is also ineffective for "reduc[ing] the severity of cold symptoms." Indeed, the 2013 Cochrane Report[9] concluded that even a milligram formulation of zinc *was not associated with a reduction of the severity of common cold symptoms*. Thus, the Cochrane Report also demonstrates that Defendant's representation that the Cold-EEZE Products "reduce[] the severity of cold symptoms:  cough, sore throat, nasal congestion, post nasal drip and/or hoarseness" is

---

[8] Turner and Cenarowski, *Effect of Treatment with Zinc Gluconate or Zinc Acetate on Experimental and Natural Colds*, Clinical Infectious Diseases.  2000; 31:1202-8.

[9] The 2011 Cochrane Systematic Review cited by Defendant was updated by the authors in 2013. *See* Singh M, Das RR., "Zinc for the Common Cold", 12 Cochrane Database of Systematic Reviews 2013 CD001364, *abstract available at* http://onlinelibrary.wiley.com/doi/10.1002/14651858.CD001364.pub4/abstract (last visited May 15, 2014).

affirmatively false and misleading.

21.     As these clinical studies demonstrate, Defendant's Cold-EEZE Products are not effective.  Despite knowledge of these adverse studies – one of which was partially funded by Defendant – Defendant continues to unequivocally claim that with its proprietary zinc formula, Cold-EEZE reduces the duration and severity of the common cold.  Moreover, even though these studies contradict Defendant's claims, Defendant intentionally omits these adverse studies from the section of its website dedicated to discussing the clinical studies.  Thus, despite Defendant's knowledge about the study results showing the falsity of its Misrepresentations, Defendant continues to showcase the Misrepresentations prominently on its Cold-EEZE packaging.

*C. The Clinical Studies Cited By Defendant Are Unsound*

22.     On the labeling of the Cold-EEZE Products, Defendant deceptively represents that Cold-EEZE's efficacy is shown by "two clinical studies," which Defendant represents as "independent double blind studies" conducted by Mossad, *et al*. in 1996 (the "Mossad Study")[10] and Godfrey, *et al*. in 1992 (the "Godfrey Study").[11]  On its "Cold-EEZE Clinical Studies" webpage, Defendant once again identifies the Mossad and Godfrey studies, as well as six other purportedly "published, peer-reviewed clinical studies that show the powerful and safe effects" of Cold-EEZE.[12]  These studies, however, do not demonstrate Defendant's claims.

23.     As an initial matter, these two studies are *not "independent."*  One of the authors of the Mossad Study, Dr. Michael L. Macknin, had a financial interest in Cold-EEZE when the study results were published, a fact not revealed until after the study was published.  The principal author of the Godfrey study, John C. Godfrey, not only *owned the patent on Cold-EEZE's active ZGG ingredient*, but had also sold the exclusive distribution rights to the formula to Quigley in exchange for a 3% royalty and a 2% consulting fee based on Cold-EEZE sales.  Despite its duty to disclose

---

[10] Mossad S.B., Macknin J.L., Medendorp S.V., Mason P., *Zinc Gluconate Lozenges for Treating the Common cold: A Randomized, Double Blind, Placebo-Controlled Study*, Am. Intern. Med. 1996; 125: 81-8.

[11] Godfrey J.C., Conant Sloane B. Smith D.S., Turco J.H., Mercer N., Godfrey N.J., *Zinc Gluconate and the Common Cold: A Controlled Clinical Study*, J. Int. Med. Res. 1992; 20:234-46.

[12] *See* http://coldeeze.com/about#studies (last visited May 15, 2014).

this information, Defendant relied on these studies while omitting the fact that they were conducted by interested insiders.

24.     Moreover, these studies are fundamentally flawed.  In the Caruso Study, the authors determined that the studies cited by Defendant were plagued by a host of experimental design defects.[13]  Per the authors, competent and reliable clinical studies require, *inter alia*, the following:

> ***Validated case definition***. The validated case definition provides signal quality and reduces noise by ensuring that the cases have the disease of interest based on validated criteria for diagnosis. "Signal quality" refers to the accurate measurement of an event (signal) of interest—in this case, cold symptoms—without dilution of the signal by similar events, such as respiratory symptoms due to other causes, such as allergy or respiratory tract irritants that would represent "noise."

> ***Quantifiable hypothesis***. A quantifiable hypothesis provides an end point, which allows for the calculation of sample size relative to defined statistical power. This addresses the problem of chance.

> ***Sample size calculation***. Given a quantifiable hypothesis, calculations should be performed to assure that a study has a large enough sample size to meet a predetermined statistical power. This also addresses the problem of chance.

> ***Randomized assignment***. Random assignment of cases to the experimental and control groups is necessary to ensure that study populations are as similar as possible. This reduces known and unknown biases that may affect the validity of the results.

> ***Double blinding***. Unblinded studies are biased toward finding a treatment effect. Data should be supplied to show that blinding was not only attempted but also was effective. This is especially important for zinc preparations, which characteristically have a "medicinal" taste and often lead to nausea.

> ***Proof of blinding***. A separate, controlled experiment to test the adequacy of blinding should ideally be performed before the clinical trial is conducted. When performed after the study, it is acceptable only in a negative study. In a positive study, post study proof of blinding is unacceptable, because there is no way to determine whether judgments were made on the basis of a bias or a true therapeutic effect.

> ***Measurement of compliance***. Signal quality is also dependent on the degree of compliance of subjects. Compliance should be monitored to evaluate the amount of bias that could result from subjects' failure to take study preparations as directed.

---

[13] *See* Thomas J. Caruso, *et al., Treatment of Naturally Acquired Common Colds With Zinc: A Structured Review,* Clin. Infect. Dis. 2007;45:569-74 ("Caruso Study").

***Measurement of dropout rate***. Dropout rates should be measured to evaluate whether statistical power was maintained.

***Intent-to-treat analysis***. Results should be analyzed by the intent-to-treat principle to maintain randomization and statistical power. Scores from all cold symptoms included in the research protocol should be reported.

***Methods of statistical analysis***. A description of the methods of statistical analysis should be provided to assess the appropriateness of the tests applied to the data.

***Measurements of probability***. This information should be provided to evaluate the precision of the findings.

25.     The Caruso Study found that the "two clinical studies" on the product label upon which Defendant bases its claims suffer from several material deficiencies, including no proof of blinding, no quantifiable hypothesis, no microbiological common cold diagnosis, and no intent-to-treat analysis, all of which are necessary components of a competent and reliable clinical or scientific trial.

26.     The purported clinical studies upon which Defendant relies and directs consumers to are not properly constructed clinical studies and do not constitute clinical proof of Cold-EEZE's effectiveness.  In fact, these do not in any way indicate that the Cold-EEZE Products do what Defendant claims.  For example, the Godfrey Study did not even test a Cold-EEZE product – instead, the subjects consumed a dose of ***23.7 mg of zinc gluconate glycine*** ("ZGG") about eight times per day.  This is a significantly higher dose than contained in Cold-EEZE, which purports to contain 13.3 mg of ZGG (i.e., 44% less).  Moreover, the Godfrey Study had no quantifiable hypothesis, no sample size calculation, no intent-to-treat analysis, and no proof of blinding.  Proof of blinding was also lacking in the Mossad Study.  *See* Caruso Study at 571-72.  Given that the zinc lozenges have a distinct metallic aftertaste,[14] subjects could not have possibly been "blinded" since it was clear which lozenges contained zinc and which did not.  *See* Caruso Study at 572.  The Mossad Study itself identified seven additional "limitations" of its study.  *See* Mossad Study at 87.

---

[14] For example, the Mossad Study reported that many patients reported that the "lozenges had an aftertaste."

27.     As a result, neither of the two studies specifically cited and relied upon on the labeling of Cold-EEZE supports Defendant's claim that Cold-EEZE "reduce[s] the duration of the common cold" and "reduce[s] the severity of cold symptoms."

28.     Moreover, the six other studies Defendant identifies on its website as purportedly supporting its claims suffer from even greater shortcomings.[15]  Three of the six studies tested zinc formulations different from the one used in the Cold-EEZE Products (zinc gluconate glycine), thereby rendering their results unrelated to the efficacy of the Cold-EEZE Products.[16]  The three other "studies" identified by Defendant are not actually studies but rather summaries and re-analyses of past studies.[17]

---

[15] *See* http://coldeeze.com/uploaded_files/files/displaypdf-studies.php (last visited May 15, 2014).

[16] Geist F, Bateman J, Hayden F. In vitro activity of zinc salts against human rhinoviruses. *Antimicrobial Agents and Chemotherapy* 1987;31:622–4.  (Testing zinc gluconate but *not* zinc gluconate glycine).

Korant BD, Butterworth BE. Inhibition by zinc of rhinovirus protein cleavage: interaction of zinc with capsid polypeptides. *Journal of Virology* 1976; 18: 298-306.  (Testing zinc choloride and zinc acetate).

Prasad AS, Beck FWJ, Bao B, Snell D, Fitzgerald JT. Duration and severity of symptoms and level of plasma Interleukin-1 receptor antagonist, soluble tumor necrosis factor receptor, and adhesion molecules in patients with common cold treated with zinc acetate. *Journal of Infectious Diseases* 2008; 197:795-802.  (Testing zinc acetate).

[17] Novick SG, Godfrey JC, Godfrey NJ, Wilder HR. How does zinc modify the common cold? Clinical observations and implications regarding mechanisms of action. *Medical Hypotheses* 1996;46:295–302. (Reviewing earlier studies and hypothesizing a possible explanation for *how* zinc lozenges work).

Eby GA. Zinc lozenges: cold cure or candy? Solution chemistry determinations. *Bioscience Reports* 2004;24:23–39, at 24 ("In this ***re-analysis*** of all published reports of double-blind, placebo controlled clinical trials of zinc lozenges against the duration of common colds …") (emphasis added).

Singh M, Das RR. Zinc for the common cold. *Cochrane Database of Systematic Reviews* 2011, Issue 2. Art. No.: CD001364.  DOI: 10.1002/14651858.CD001364.pub3.  (Screening 144 past studies, identifying and re-analyzing 15 of those, and drawing conclusions).

### D. *Defendant Labels Cold-EEZE As Homeopathic To Escape FDA Scrutiny And To Deceive Consumers About Its Effectiveness*

29.     Defendant labels its Cold-EEZE Products "homeopathic" for one reason – to avoid the FDA's stringent regulations and scrutiny.  Stated otherwise, unlike traditional drugs, homeopathic products are not regulated by the FDA.  Since Defendant labels the Cold-EEZE Products as homeopathic, the FDA does not regulate Defendant's statements and representations, thus leaving consumers in the dark regarding the veracity of those statements and representations.  Indeed, to determine whether *non*-homeopathic OTC drugs are safe, effective, and not misbranded, the FDA subjects non-homeopathic OTC drugs to stringent evaluations and testing using a drug monograph system created by the FDA.  *See* 21 C.F.R. §§ 330.1, 330.10.  In drafting the monographs, the FDA divided the non-homeopathic OTC drugs into drug categories, which were then assigned an advisory review panel of qualified experts who evaluate the safety and effectiveness of the non-homeopathic OTC drugs.  The panel also reviews the drugs' labeling and advises the FDA Commissioner on the promulgation of monographs establishing conditions under which non-homeopathic OTC drugs listed within each monograph are generally recognized as safe, effective, and not misbranded.  *Id.* § 330.10(a).

30.     Under this system, a manufacturer seeking approval of a new, non-homeopathic OTC drug must submit a detailed new drug application, which must include:

> [E]vidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof.

21 U.S.C. § 355.  Moreover, after the FDA approves a new drug application, any change in the drug's labeling requires a supplement to the application and further approval by the FDA either before or after the change.  21 C.F.R. §§ 314.70(b), (c), 314.71.

31.     In stark contrast, homeopathic OTC drugs, including the Cold-EEZE Products, are neither approved nor authorized by the FDA.  As stated on the bottom of Cold-EEZE's website, "These statements have not been reviewed by the Food and Drug Administration."

---

CLASS ACTION COMPLAINT                                                                              13

32.      Furthermore, on the U.S. National Library of Medicine ("the NLM") website responsible for providing information about FDA drug listing information, the NLM specifically states the following about Cold-EEZE: "THIS HOMEOPATHIC PRODUCT HAS NOT BEEN EVALUATED BY THE FOOD AND DRUG ADMINISTRATION FOR SAFETY OR EFFICACY.  [THE] FDA IS NOT AWARE OF SCIENTIFIC EVIDENCE TO SUPPORT HOMEOPATHY AS EFFECTIVE."[18]

## CLASS ACTION ALLEGATIONS

33.      Plaintiff seeks to represent a class defined as all persons in California who purchased Cold-EEZE for personal or household use, excluding those who purchased Cold-EEZE for resale (hereafter, the "Class").

34.      Members of the Class are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class number in the hundreds of thousands.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery of the records of Defendant and third party retailers and vendors.  Class members may be notified of the pendency of this action by mail, email, and/or publication through the distribution records of Defendant and third party retailers and vendors.

35.      Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  These common legal and factual questions include, but are not limited to whether Defendant's labeling, advertising, and marketing of Cold-EEZE is false and misleading as complained herein.

36.      The claims of the named Plaintiff are typical of the claims of the Class in that Plaintiff (a) was exposed to Defendant's false and misleading labeling, packaging, marketing, and promotion of Cold-EEZE; (b) relied on Defendant's Misrepresentations; and (c) suffered a loss as a

[18] *See* "COLD-EEZE" (zinc gluconate) lozenge [ProPhase Labs, Inc.],"
http://dailymed.nlm.nih.gov/dailymed/lookup.cfm?setid=969b0895-0d14-47e7-adf8-33730c69e686
(last visited May 15, 2014).

CLASS ACTION COMPLAINT

14

result of his purchase.  Each Class member was subjected to the same conduct, was harmed in the same way, and has claims for relief under the same legal theories.

37.     Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

38.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## COUNT I

### (Breach of Express Warranty)

39.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

40.     Plaintiff brings this Count I individually and on behalf of the members of the Class against Defendant.

41.     In connection with the sale of the Cold-EEZE Products, Defendant issued express warranties including the Misrepresentations, such as the Cold-EEZE Products "reduce the duration of the common cold;" "reduce[] the severity of cold symptoms:  cough, sore throat, nasal

congestion, post nasal drip and/or hoarseness;" "[s]horten[] your cold, works faster;" are "[c]linically proven to reduce the duration of the common cold;" are "clinically proven to shorten your cold by almost half;" and that "[c]linical studies have shown:  [t]he unique Cold-EEZE formula reduces the duration of the common cold by almost half."  Defendant expressly warranted that the Cold-EEZE Products were effective and would prevent, reduce the duration, and reduce the severity of the common cold.

42.     Defendant's affirmations of fact and promises made to Plaintiff and members of the Class on the Cold-EEZE Product labels and advertisements became part of the basis of the bargain between Defendant and Plaintiff and members of the Class, thereby creating express warranties that the Cold-EEZE Products would conform to Defendant's affirmations of fact, representations, promises, and descriptions.

43.     Defendant breached its express warranties because the Cold-EEZE Products do not in fact prevent, shorten, or reduce the severity of the common cold or cold symptoms.  In short, the Cold-EEZE Products do not perform as expressly warranted.

44.     Plaintiff and members of the Class were injured as a direct and proximate result of Defendant's breach because:  (a) they would not have purchased the Cold-EEZE Products had they known that the products were not clinically proven to reduce the duration of the common cold, were not effective for reducing the duration of the common cold, and were not effective for reducing the severity of cold symptoms per Defendant's Misrepresentations; (b) they purchased the Cold-EEZE Products based on Defendant's Misrepresentations; and (c) the Cold-EEZE Products did not have the characteristics and benefits promised.  As a result, Plaintiff and members of the Class have been damaged in the amount of the purchase price of the Cold-EEZE Products, i.e., the difference in value between the Cold-EEZE Products as advertised and the Cold-EEZE Products as actually sold.  Because the Cold-EEZE Products are ineffective, they are totally worthless.

## COUNT II

### (Breach of Implied Warranty of Merchantability)

45.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

46.     Plaintiff brings this Count II individually and on behalf of the members of the Class against Defendant.

47.     Defendant, as the designer, manufacturer, marketer, distributor, and/or seller, impliedly warranted that the Cold-EEZE Products would prevent, shorten, and reduce the severity of the symptoms of the common cold.

48.     Defendant, through its acts and omissions set forth herein, in its sale, marketing, and promotion of the Cold-EEZE Products, made implied representations to Plaintiff and members of the Class that its Cold-EEZE Products were effective at preventing, reducing the duration, and reducing the severity of the common cold.

49.     Defendant's Cold-EEZE Products were entirely useless for their ordinary purpose of preventing, reducing the duration of, and relieving the symptoms of the common cold.  The Cold-EEZE Products were not of fair and average quality within Defendant's description.  The Cold-EEZE Products were also not labeled as required because the Cold-EEZE Products' packaging contains numerous misrepresentations.  The Cold-EEZE Products do not conform with the promises on their labels.

50.     Defendant breached its implied warranties because the Cold-EEZE Products did not and cannot prevent, reduce the duration, or reduce the severity of the common cold.  As a result of Defendant's conduct, Plaintiff and members of the Class did not receive the goods as impliedly warranted by Defendant to be merchantable or fit for the purpose they were sold.

51.     Plaintiff and members of the Class have sustained damages as a proximate result of the foregoing breach of implied warranty in an amount to be determined at trial.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COUNT III**

**(Violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*)**

52.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

53.     Plaintiff Gibbs brings this Count III individually and on behalf of the Class against Defendant.

54.     Plaintiff Gibbs and members of the Class are consumers who purchased the Cold-EEZE Products for personal, family, or household purposes.  Accordingly, Plaintiff Gibbs and members of the Class are "consumers" as that term is defined by the CLRA in Cal. Civ. Code § 1761(d).  Plaintiff Gibbs and members of the Class are not sophisticated experts with independent knowledge of the formulation or efficacy of the homeopathic Cold-EEZE Products.

55.     At all relevant times, Cold-EEZE Products constituted "goods" as that term is defined in Cal. Civ. Code § 1761(a).

56.     At all relevant times, Defendant was a "person" as that term is defined in Civ. Code § 1761(c).

57.     At all relevant times, Plaintiff Gibbs's purchase of the Cold-EEZE Products, and the purchases of other Class members, constituted  "transactions" as that term is defined in Cal. Civ. Code § 1761(e).  Defendant's actions, representations, and conduct have violated, and continue to violate the CLRA, because they extend to transactions that intended to result, or which have resulted in, the sale of goods to consumers.

58.     The policies, acts, and practices described in this Complaint were intended to and did result in the sale of Cold-EEZE Products to Plaintiff Gibbs and members of the Class. Defendant's practices, acts, policies, and course of conduct violated the CLRA §1750 *et seq.* as described above.

---

CLASS ACTION COMPLAINT                                                        18

59.     Defendant represented that the Cold-EEZE Products have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have in violation of Cal. Civ. Code § 1770(a)(5).

60.     Defendant represented that the Cold-EEZE Products were of a particular standard, quality, and grade, when they were of another, in violation of California Civil Code § 1770(a)(7).

61.     Defendant represented that the Cold-EEZE Products were of a particular standard or quality when Defendant was aware that they were of another in violation of § 1770(a)(7) of the CLRA.  Defendant maintained that the Cold-EEZE Products prevented, reduced the duration, and reduced the severity of the common cold when they did not.

62.     Defendant advertised the Cold-EEZE Products with the intent not to sell them as advertised in violation of § 1770(a)(9) of the CLRA.  Defendant did not intend to sell the Cold-EEZE Products as advertised because Defendant knew that the homeopathic dilution of the ingredients in the Cold-EEZE Products would not effectively prevent, reduce the duration, or reduce the severity of the common cold.  Defendant knew that the Cold-EEZE Products' so-called active ingredients are ineffective and inactive homeopathic concentrations.

63.     Defendant violated California Civil Code §§ 1770(a)(5), (7), and (9) by representing that the Cold-EEZE Products were effective at preventing, reducing the duration, and reducing the severity of the common cold when, in fact, they were not.

64.     Plaintiff Gibbs and members of the Class suffered injuries caused by Defendant's misrepresentations because:  (a) they would not have purchased the Cold-EEZE Products had they known that the products were not clinically proven to reduce the duration of the common cold, were not effective for reducing the duration of the common cold, and were not effective for reducing the severity of cold symptoms per Defendant's Misrepresentations; (b) they purchased the Cold-EEZE Products based on Defendant's Misrepresentations; and (c) the Cold-EEZE Products did not have the characteristics and benefits promised.  As a result, Plaintiff Gibbs and members of the Class have been damaged in the full amount of the purchase price of the Cold-EEZE Products.

65.     Prior to the filing of this Complaint, a CLRA notice letter was served on Defendant which complies in all respects with California Civil Code § 1782(a).  A true and correct copy of Plaintiff Gibbs's letter is attached as Exhibit A.  On May 2, 2014, Plaintiff Gibbs sent Defendant a letter via certified mail, return receipt requested, advising Defendant that it is in violation of the CLRA and must correct, repair, replace, or otherwise rectify the goods alleged to be in violation of § 1770.  Defendant was further advised that in the event that the relief requested had not been provided within thirty (30) days, Plaintiff Gibbs would bring an action for damages pursuant to the CLRA.  Wherefore, Plaintiff Gibbs seeks damages, restitution, and injunctive relief for this violation of the CLRA.  On May 7, 2014, Defendant sent an email acknowledging receipt of the CLRA notice letter.

66.     Plaintiff Gibbs and the members of the Class seek damages, restitution, and injunctive relief for this violation of the CLRA.

## COUNT IV

**(Violation of the False Advertising Law ("FAL"), Bus. & Prof. Code. §§ 17500 *et seq.*)**

67.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

68.     Plaintiff Gibbs brings this Count IV individually and on behalf of the Class against Defendant.

69.     California's FAL (Bus. & Prof. Code §§17500, *et seq.*) makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, . . . in any advertising device . . . or in any other manner or means whatever, including over the Internet, any statement, concerning . . . personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

70.     Throughout the Class Period, Defendant committed acts of false advertising, as defined by the FAL, by using false and misleading statements to promote the sale of the Cold-EEZE Products, as described above, and including, but not limited to, that the Cold-EEZE Products

"reduce the duration of the common cold," "reduce[] the severity of cold symptoms:  cough, sore throat, nasal congestion, post nasal drip and/or hoarseness," "[s]horten[] your cold, works faster," are "[c]linically proven to reduce the duration of the common cold," and that "[c]linical studies have shown:  [t]he unique Cold-EEZE formula reduces the duration of the common cold by almost half."

71.     Defendant knew or should have known through the exercise of reasonable care that these statements were untrue and misleading.

72.     Defendant's actions in violation of the FAL were false and misleading such that the general public is and was likely to be deceived.

73.     As a direct and proximate result of these acts, consumers have been and are being harmed.  Plaintiff Gibbs and members of the Class have suffered injury and actual out-of-pocket losses as a result of Defendant's FAL violation because:  (a) they would not have purchased the Cold-EEZE Products had they known that the products were not clinically proven to reduce the duration of the common cold, were not effective for reducing the duration of the common cold, and were not effective for reducing the severity of cold symptoms per Defendant's Misrepresentations; (b) they purchased the Cold-EEZE Products based on Defendant's Misrepresentations; and (c) the Cold-EEZE Products did not have the characteristics and benefits promised.  Plaintiff Gibbs and members of the Class have been damaged in the full amount of the purchase price of the Cold-EEZE Products.

74.     Plaintiff Gibbs brings this action pursuant to Bus. & Prof. Code § 17535 for injunctive relief to enjoin the practices described herein and to require Defendant to issue corrective disclosures to consumers.  Plaintiff Gibbs and the Class are therefore entitled to: (a) an order requiring Defendant to cease the acts of unfair competition alleged herein; (b) full restitution of all monies paid to Defendant as a result of its deceptive practices; (c) interest at the highest rate allowable by law; and (d) the payment of Plaintiff's attorneys' fees and costs pursuant to, inter alia, California Code of Civil Procedure §1021.5.

## COUNT V

### (Violation of the "Unlawful Prong" of the Unfair Competition Law ("UCL"),

### Bus. & Prof. Code §§ 17200 *et seq.*)

75.      Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

76.      Plaintiff Gibbs brings this Count V individually and on behalf of the Class against Defendant.

77.      The UCL, Bus. & Prof. Code § 17200 *et seq.*, provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising …."  The UCL also provides for injunctive relief and restitution for UCL violations.

78.       "By proscribing any unlawful business practice, section 17200 borrows violations of other laws and treats them as unlawful practices that the UCL makes independently actionable." *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 180 (1999) (citations and internal quotation marks omitted).

79.      Virtually any law or regulation – federal or state, statutory, or common law – can serve as a predicate for an UCL "unlawful" violation.  *Klein v. Chevron U.S.A., Inc.*, 202 Cal. App. 4th 1342, 1383 (2012).

80.      Defendant violated the "unlawful prong" by violating the CLRA, and the FAL, as well as by breaching express and implied warranties as described herein.

81.      As a direct and proximate result of these acts, consumers have been and are being harmed.  Plaintiff  Gibbs and members of the Class have suffered injury and actual out-of-pocket losses as a result of Defendant's UCL "unlawful prong" violation because:  (a) they would not have purchased the Cold-EEZE Products had they known that the products were not clinically proven to reduce the duration of the common cold, were not effective for reducing the duration of the common cold, and were not effective for reducing the severity of cold symptoms per Defendant's Misrepresentations; (b) they purchased the Cold-EEZE Products based on Defendant's

Misrepresentations; and (c) the Cold-EEZE Products did not have the characteristics and benefits promised.

82.     Pursuant to Bus. & Prof. Code §17203, Plaintiff Gibbs and the Class are therefore entitled to: (a) an order requiring Defendant to cease the acts of unfair competition alleged herein; (b) full restitution of all monies paid to Defendant as a result of its deceptive practices; (c) interest at the highest rate allowable by law; and (d) the payment of Plaintiff's attorneys' fees and costs pursuant to, *inter alia*, California Code of Civil Procedure §1021.5.

## COUNT VI

### (Violation of the "Fraudulent Prong" of the Unfair Competition Law, Bus. & Prof. Code §§ 17200, *et seq.*)

83.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

84.     Plaintiff Gibbs brings this Count VI individually and on behalf of the Class against Defendant.

85.     The UCL, Bus. & Prof. Code § 17200 *et seq.*, provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising …."

86.     Defendant's conduct, described herein, violated the "fraudulent" prong of the UCL because Defendant represented that the Cold-EEZE Products prevent, reduce the duration, and reduce the severity of the common cold when, in fact, they do not.  As described above, Defendant misrepresented that the Cold-EEZE Products "reduce the duration of the common cold," "reduce[] the severity of cold symptoms:  cough, sore throat, nasal congestion, post nasal drip and/or hoarseness," "[s]horten[] your cold, works faster," are "[c]linically proven to reduce the duration of the common cold," and that "[c]linical studies have shown:  [t]he unique Cold-EEZE formula reduces the duration of the common cold by almost half."

87.     Plaintiff Gibbs and members of the Class Members acted reasonably when they purchased Defendant's Cold-EEZE Products based on their belief that Defendant's Misrepresentations were true.

88.     Defendant knew or should have known, through the exercise of reasonable care, that its Misrepresentations about the Cold-EEZE Products were untrue and misleading.

89.     As a direct and proximate result of these acts, consumers have been and are being harmed.  Plaintiff Gibbs and members of the Class have suffered injury and actual out-of-pocket losses as a result of Defendant's UCL "fraudulent prong" violation because:  (a) they would not have purchased the Cold-EEZE Products had they known that the products were not clinically proven to reduce the duration of the common cold, were not effective for reducing the duration of the common cold, and were not effective for reducing the severity of cold symptoms per Defendant's Misrepresentations; (b) they purchased the Cold-EEZE Products based on Defendant's Misrepresentations; and (c) the Cold-EEZE Products did not have the characteristics and benefits promised.

90.     Pursuant to Bus. & Prof. Code §17203, Plaintiff Gibbs and members of the Class are therefore entitled to: (a) an order requiring Defendant to cease the acts of unfair competition alleged herein; (b) full restitution of all monies paid to Defendant as a result of its deceptive practices; (c) interest at the highest rate allowable by law; and (d) the payment of Plaintiff's attorneys' fees and costs pursuant to, inter alia, California Code of Civil Procedure §1021.5.

## COUNT VII

**(Violation of the "Unfair Prong" of the Unfair Competition Law,**

**Bus. & Prof. Code §§ 17200 *et seq.*)**

91.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

92.     Plaintiff Gibbs brings this Count VII individually and on behalf of the Class against Defendant.

93.     The UCL, Bus. & Prof. Code § 17200 *et seq.*, provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising …."

94.     Defendant's misrepresentations and other conduct, described herein, violated the "unfair" prong of the UCL in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the gravity of the conduct outweighs any alleged benefits.  Defendant's conduct is unfair in that the harm to Plaintiff Gibbs and the Class arising from Defendant's conduct outweighs the utility, if any, of those practices.

95.     Defendant's practices as described herein are of no benefit to consumers who are tricked into paying for the ineffective Cold-EEZE Products.  Defendant's practice of injecting misinformation into the marketplace about the treatment of the common cold is unethical and unscrupulous.  Defendant's practices are also substantially injurious to consumers because, among other reasons, consumers may forego other necessary treatment for their illnesses because of their mistaken belief that the Cold-EEZE Products will prevent, shorten, and alleviate the symptoms of the common cold.  For this reason, Defendant's challenged practices may be dangerous.

96.     As a direct and proximate result of these acts, consumers have been and are being harmed.  Plaintiff Gibbs and members of the Class have suffered injury and actual out-of-pocket losses as a result of Defendant's UCL "unfair prong" violation because:  (a) they would not have purchased the Cold-EEZE Products had they known that the products were not clinically proven to reduce the duration of the common cold, were not effective for reducing the duration of the common cold, and were not effective for reducing the severity of cold symptoms per Defendant's Misrepresentations; (b) they purchased the Cold-EEZE Products based on Defendant's Misrepresentations; and (c) the Cold-EEZE Products did not have the characteristics and benefits promised.

97.     Pursuant to Bus. & Prof. Code §17203, Plaintiff Gibbs and members of the Class are therefore entitled to: (a) an order requiring Defendant to cease the acts of unfair competition alleged herein; (b) full restitution of all monies paid to Defendant as a result of its deceptive

practices; (c) interest at the highest rate allowable by law; and (d) the payment of Plaintiff's

attorneys' fees and costs pursuant to, inter alia, California Code of Civil Procedure §1021.5.

## **PRAYER FOR RELIEF**

98.    WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated,

seeks judgment against Defendant as follows:

    a.    For an order certifying the Class under Rule 23 of the Federal Rules of Civil

    Procedure and naming Plaintiff as representative of the Class and Plaintiff's

    attorneys as Class Counsel;

    b.    For an order declaring that Defendant's conduct violates the statues

    reference herein;

    c.    For an order finding in favor of Plaintiff, and the Class on all counts asserted

    herein;

    d.    For statutory, compensatory, punitive damages, restitution, and/or

    disgorgement in amounts to be determined by the Court and/or jury;

    e.    For prejudgment interest on all amounts awarded;

    f.    For an order of restitution and all other forms of equitable monetary relief;

    g.    For injunctive relief as pleaded or as the Court may deem proper;

    h.    For an order awarding Plaintiff, and the Class their reasonable attorneys'

    fees, and expenses; and

    i.    For such other and further relief as the Court may deem proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all causes of action and issues so triable.

1

2    Dated:  February 25, 2015                  Respectfully submitted,

3                                               **BURSOR & FISHER, P.A.**

4                                               By:_____/s/ Annick Persinger___
                                                        Annick M. Persinger
5
                                                L. Timothy Fisher (State Bar No. 191626)
6                                               Annick M. Persinger (State Bar No. 272996)
                                                Yeremey Krivoshey (State Bar No. 295032)
7                                               1990 North California Boulevard, Suite 940
                                                Walnut Creek, CA  94596
8                                               Telephone: (925) 300-4455
                                                Facsimile:  (925) 407-2700
9                                               E-Mail: ltfisher@bursor.com
                                                        apersinger@bursor.com
10                                                      ykrivoshey@bursor.com

11

12                                              *Attorneys for Plaintiff*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT                                                        27

1

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

2

I, J. Loren Gibbs, declare as follows:

3
4
5

1.    I am a plaintiff in this action and a citizen of the State of California residing in Belmont. I have personal knowledge of the facts stated herein and, if called as a witness, I could and would testify competently thereto.

6
7
8

2.    Defendants conduct substantial business in New York, California and nationwide. Therefore, the complaint filed in this action is filed in the proper place pursuant to Cal. Civ. Code. 1780(d).

9
10
11
12
13
14
15
16
17
18

3.    I purchased a Cold-EEZE Cold Remedy in Alameda, California for my personal use. I read the label on the Cold-EEZE product packaging, and purchased the product in reliance on the claims including, but not limited to, the statements that Cold-EEZE was clinically proven to reduce the duration of the common cold and would reduce the severity of my cold symptoms including cough, sore throat, nasal congestion, post nasal drip and/or hoarseness. These representations were substantial factors influencing my decision to purchase Cold-EEZE Cold Remedy Lozenges. I would not have purchased Cold-EEZE Cold Remedy Lozenges had I known that the product was not clinically proven to shorten my cold, and would not prevent, shorten, or reduce the severity of my cold symptoms.

19
20
21

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct, executed on July 28, 2014 at Belmont, California.

22
23
24

_____
J. Loren Gibbs

25
26
27
28

**EXHIBIT A**

# BURSOR & FISHER

P.A.

1990 N. California Blvd.
SUITE 940
WALNUT CREEK, CA 94596
www.bursor.com

ANNICK M. PERSINGER
Tel: 925.300.4455
Fax: 925.407.2700
apersinger@bursor.com

May 2, 2014

## *Via Certified Mail - Return Receipt Requested*

ProPhase Labs, Inc.
621 North Shady Retreat Road
Doylestown, PA 18901

Theodore W. Karkus
c/o ProPhase Labs, Inc.
621 North Shady Retreat Road
Doylestown, PA 18901

Robert V. Cuddihy, Jr.
c/o ProPhase Labs, Inc.
621 North Shady Retreat Road
Doylestown, PA 18901

*Re:    Demand Letter Pursuant to California Civil Code § 1782,
         Violation of Magnuson-Moss Act, 15 U.S.C. §§ 2301, et seq., and other applicable laws.*

To Whom It May Concern:

This letter serves as a notice and demand for corrective action on behalf of my client, J. Loren Gibbs, and all other persons similarly situated, arising from breaches of warranty under the Magnuson-Moss Warranty Act and violations of numerous provisions of California law including the Consumers Legal Remedies Act, Civil Code § 1770, including but not limited to subsections (a)(5), (7), and (9). This letter also serves as notice pursuant to Cal. Com. Code § 2607(3)(a) concerning the breaches of express and implied warranties described herein.

You have participated in the manufacture, marketing, and sale of Cold-EEZE Cold Remedy products. Cold-EEZE products have been, and continue to be, marketed and sold as "clinically proven to reduce the duration of the common cold." Specifically, the packaging and labeling of Cold-EEZE products represent that "Clinical Studies have shown: The unique Cold-EEZE formula reduces the duration of the common cold by almost half." These representations are false and misleading because Cold-EEZE Cold Remedy products claims are not, in fact, clinically proven to reduce the duration of the common cold by almost half.

Your conduct with respect to the promotion and marketing of the Cold-EEZE Cold Remedy products is false and misleading. As stated above, such conduct includes, but is not limited to, representing that the Cold-EEZE Products are "clinically proven to reduce the

duration of the common cold" and by representing that "Clinical Studies have shown: The unique Cold-EEZE formula reduces the duration of the common cold by almost half." The Cold-EEZE product labels and advertising are false and misleading because the ingredient in the products, zincum gluconicum, is diluted, which renders that ingredient completely inactive. Since the ingredients in Cold-EEZE Cold Remedy products have no pharmacological effect, Cold-EEZE Cold Remedy products are not "clinically proven to reduce the duration of the common cold." Furthermore, the two clinical studies cited on the products' packaging and labels – those conducted at the Cleveland Clinic and Dartmouth College – suffer from several material deficiencies including no proof of blinding, no quantifiable hypothesis, no microbiological common cold diagnosis, and no intent-to-treat analysis, all of which are necessary components of a competent and reliable clinical or scientific trial.

Mr. Gibbs, a resident of California, purchased Cold-EEZE Cold Remedy based on representations on the label and in other marketing and advertising material stating that the product were clinically proven to reduce the duration of the common cold. Cold-EEZE Cold Remedy did not reduce the duration of his cold. He would not have purchased Cold-EEZE Cold Remedy had he known that the product is ineffective at shortening the duration of colds.

Mr. Gibbs is acting on behalf of a class defined as all persons in the United States who purchased Cold-EEZE Cold Remedy (hereafter, the "Class"). He is also acting on behalf of a subclass of Class members who purchased Cold-EEZE Cold Remedy in the state of California (the "California Sublcass").

To cure the defects described above, we demand that you (1) cease and desist from continuing to mislabel Cold-EEZE Cold Remedy products; (2) issue an immediate recall on any Cold-EEZE Cold Remedy products bearing false labels; and (3) make full restitution to all purchasers of Cold-EEZE Cold Remedy products of all purchase money obtained from sales thereof.

We further demand that you preserve all documents and other evidence which refer or relate to any of the above-described practices including, but not limited to, the following:

1. All documents concerning the ingredients, formula, and manufacturing process for Cold-EEZE Cold Remedy products;

2. All communications with the U.S. Food and Drug Administration concerning the product development, manufacturing, marketing, and sales of Cold-EEZE Cold Remedy products;

3. All documents concerning the advertisement, marketing, or sale of Cold-EEZE Cold Remedy products; and

4. All communications with customers concerning complaints or comments concerning Cold-EEZE Cold Remedy products.

BURSOR&FISHER
P.A.

We are willing to negotiate to attempt to resolve the demands asserted in this letter.  If you wish to enter into such discussions, please contact me immediately.  If I do not hear from you promptly, I will conclude that you are not interested in resolving this dispute short of litigation.  If you contend that any statement in this letter is inaccurate in any respect, please provide us with your contentions and supporting documents promptly.

Very truly yours,

Annick M. Persinger